IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs March 7, 2017

**STATE OF TENNESSEE v. JAMES EARNEST SMITH**

**Appeal from the Circuit Court for Chester County**
**No. 15-CR-12      Donald H. Allen, Judge**

_____

**No. W2016-01131-CCA-R3-CD**

_____

Defendant, James Earnest Smith, was indicted for one count of rape of a child and one count of aggravated sexual battery. After a jury trial, Defendant was convicted of two counts of aggravated sexual battery. The trial court merged the convictions and imposed a sentence of twelve years' confinement. On appeal, Defendant argues that the evidence was insufficient to support his convictions and that the sentence was excessive. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Lloyd R. Tatum, Henderson, Tennessee, for the appellant, James Earnest Smith.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Jody Pickens, District Attorney General; and Brian Gilliam, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts*

*Trial*

In November 2014, the victim was nine years old and lived in a home on Milam Road in Finger, Tennessee, with her mother and Defendant, her stepfather. The victim's mother and Defendant had married in 2011, and the victim referred to Defendant as "dad." Also living in the home were the victim's two younger brothers, her older stepbrother, and her younger half-sister ("sister"). The home was located on the county

line between Chester County and McNairy County, and the victim attended the fourth grade in a Chester County school.

On November 22, 2014, the victim's stepbrother, James "Hunter" Smith, was riding four-wheelers with his friends when he fell off and hit his head. The victim's mother took Hunter to the hospital in Selmer, Tennessee, around 5:30 that evening while Defendant stayed home with the other children. The victim testified that while the other children were in the living room watching television, Defendant called her into his bedroom. She testified that Defendant used his hands and touched "[m]y lower area and my up here," indicating her chest, over her clothes. Defendant then took off the victim's clothes and touched her "lower area . . . [w]here my underwear is." The victim testified that Defendant touched both the inside and outside of her "private part" with both of his hands. Defendant then took off his clothes and had the victim lie on her back on the bed while he lay next to her on his side. The victim testified that Defendant "touched me in my private areas," both inside and outside, with "[h]is private areas" and that it hurt. The victim stated that Defendant "touch[ed] my private parts at times and quit[] a few minutes and then d[id] it again." Eventually, Defendant stopped and told the victim to go to bed. The victim testified that she felt scared that Defendant "would hurt me badly." The victim put her clothes back on and left the room. It was dark outside, the other children were already asleep, and the victim was in bed before her mother and Hunter returned from the hospital.

On cross-examination, the victim testified that she shared a bedroom with her sister and that her sister would occasionally follow her if she got up in the middle of the night. However, her sister stayed in the living room watching television and did not follow the victim into Defendant's bedroom on the night in question. The victim admitted that she had previously made similar accusations against her biological father. The victim also acknowledged that she was "[k]ind of" angry at Defendant when he punished her by telling her that she would not be receiving a sewing machine as a Christmas present. The victim admitted that she cried but denied that she told Defendant "I hate you." The victim acknowledged that the incident with the sewing machine could have been the same day as the alleged assault, but she could not remember. The victim did not remember injuring her private parts on a bicycle but stated that she had testified about it previously based on what her mother had told her. The victim did not remember seeing any scars below Defendant's bellybutton. On redirect examination, the victim testified that she could not see very well during the assault because the light in the bedroom was off and she was not wearing her glasses. The victim denied accusing Defendant because she was mad about the sewing machine.

Dr. Lisa Piercy, a board-certified child abuse pediatrician, testified that she examined the victim on December 12, 2014. She spoke to the victim and the victim's mother separately to obtain a medical history before performing a physical exam. The

victim reported that Defendant, her stepfather, had touched her. When asked to elaborate, the victim reported that Defendant

> "called me into his room, made me put on a blindfold," and she said it was a blue one with white dots, "take my clothes off and then he would take his clothes off, make me lay on the bed, spread my legs, and he would try to put his private spot in mine, and it hurt. He also put his private spot in my butt and tried to put it in my mouth, but I kept it, my mouth closed. Stuff came out of his private spot that he called the juice and when it would come out in his hand, he would rub it on my chest and on my private."

The victim reported that the incident occurred on November 5, prior to the exam in December. The victim also reported that her biological father touched her when she was three or four years old, but she could not recall any details.

During the physical exam, Dr. Piercy noted that the victim was a healthy, prepubescent girl. However, Dr. Piercy noted abnormalities in the victim's hymen that she characterized as "definitive evidence of penetrating trauma." Dr. Piercy testified that the abnormalities she observed would not be due to a birth defect or be sustained while riding a horse or a bicycle. Dr. Piercy testified that these types of abnormalities are extremely rare, even in cases of known penetration. The victim did not report a history of accidental penetration, such as falling on a high-heeled shoe, and such an injury would involve bleeding and be very traumatic. Dr. Piercy testified that "the story that she gave of being vaginally penetrated was consistent with what I was seeing on examination, and there were no other explanations given to me to explain that." However, there was no way to determine how old the injury was once it had healed. Dr. Piercy did not observe any injuries to the victim's anus but explained that such injuries were even more rare due to the muscle structure of the area.

Officer Jason Crouse with the Chester County Sheriff's Department testified that he became involved in the case on December 11, 2014, when he was contacted by Investigator Jennifer Maxwell with the Department of Children's Services ("DCS"). Officer Crouse stated that a referral about the victim being involved in a sex crime had been called in to a child abuse hotline. Investigator Maxwell had already spoken to the victim by the time Officer Crouse became involved. Both Officer Crouse and Investigator Maxwell observed the victim's forensic interview on a closed circuit television in a separate room.

After the interview, Officer Crouse and Investigator Maxwell proceeded to the Milam Road address. Officer Crouse encountered Defendant outside of the home and sought consent to search for specific items mentioned by the victim during the forensic interview, specifically a blue and white bandana. Defendant agreed to speak with Officer

Crouse inside the home and gave consent to search. Officer Crouse searched Defendant's bedroom and walked through the rest of the house but was unable to find anything. Officer Crouse told Defendant that he needed to come to the sheriff's department to answer some questions about an allegation, and Defendant stated that he understood. Defendant was taken to the jail in a patrol car, and Officer Crouse interviewed him the following morning.

At the beginning of the interview, Defendant waived his *Miranda* rights. Officer Crouse informed Defendant of the allegations, but Defendant did not have much of a reaction when he was told that he was being accused of "doing something sexually inappropriate" with the victim. According to Officer Crouse, Defendant seemed very calm and did not get angry or upset, and his demeanor remained the same throughout the interview. Officer Crouse characterized Defendant as not very talkative, and the interview only lasted about thirty to forty-five minutes. Afterwards, Officer Crouse reduced Defendant's statement to writing with Defendant able to make corrections as the statement was being written and read aloud. Defendant then signed the written statement, which was entered into evidence. The statement reads as follows:

> I have been [the victim's] step-father since she was 4 or 5 years old. From time to time I have the kids alone when my wife is gone. We moved to Milam Road when [the victim's mother] was pregnant with [the victim's half-sister]. There was a 4-wheeler wreck that my son Hunter was involved in a few weeks ago. I stayed home with all the kids while [the victim's mother] and Hunter went to the Hospital. The kids were asleep and none of them came into my room. My wife had a blue bandana that has white dots all over it. I have neve[r] touched [the victim] in a sexual way.

After the victim had been examined by Dr. Piercy, Officer Crouse learned of the allegation that Defendant had taken photographs of the victim on a cellphone. The victim's mother provided a cellphone that was submitted to the Crime Lab. However, no inappropriate pictures of underage children were discovered on the phone.

Defendant testified that he was 53 years old, had graduated from the eighth grade, and had previously worked as a carpenter, welder, and maintenance technician. Defendant received Social Security disability benefits as a result of an accident in 1997 when he fell during a hayride and was crushed under the wheels. As a result of this injury Defendant had surgery on his ankles, stomach, and jaw. Defendant had significant scarring on his stomach from the surgery as well as a visible scar on his groin from the placement of a cardiac stent. Photographs of these scars were entered into evidence. Defendant and the victim's mother had lived together since 2009 and had been married for four years. They had a five-year-old daughter together, and they also lived with his

wife's three children (including the victim) from her previous marriage and Defendant's eighteen-year-old son, Hunter.

Defendant testified that he was shocked when he learned that he was being accused of sexually abusing the victim. He remembered the evening of November 22, 2014, because his son's going to the hospital was a significant event. Defendant testified that during the day, around 2:30 or 3:00 p.m., he was watching television in his bedroom with his wife and could see the children in the living room. He saw the victim hit her sister on the back, so he put her in timeout. The victim then hit one of her brothers, so Defendant told her that she would not be getting the sewing machine as her Christmas present. The victim said that she hated him and "stomped off mad." Defendant testified that the sewing machine remained in the house but the victim was not allowed to use it. Defendant did not know what happened to the sewing machine after he was arrested in December. Defendant testified that three years previously, he was told by his wife that the victim threatened to call DCS on her after she "popped [the victim] on the butt" for misbehaving during a bath. Defendant testified that the victim remained mad at him for a few days and would occasionally ask whether she would be getting the sewing machine.

Around 5:30 or 6:00 p.m. on November 22, 2014, Hunter's friends brought him back to the house after he had fallen from of one of the four-wheelers. Defendant and his wife agreed that she would take Hunter to the hospital while Defendant stayed home with the other children. Defendant testified that he fixed himself a sandwich in the kitchen and then ate his sandwich and watched television in his bedroom. Defendant testified that the children were watching television in the living room until 8:00 p.m. and that they were in bed before his wife and son returned around 8:30 p.m. The children got out of bed to see how Hunter was doing when he returned from the hospital. Defendant testified that nothing significant happened after that night until the investigator showed up. Defendant cooperated with the investigator, spent the night in jail, and agreed to waive his rights and give a statement. Defendant explained that he does not get loud or upset when he is in shock but takes time to think things through. Defendant denied touching the victim's private part with his private part and denied that he would ever touch any child in that manner.

The State recalled the victim's mother to testify in rebuttal. She denied that there was any discussion about not giving the victim the sewing machine and did not recall any of the children getting into trouble on the day she took Hunter to the hospital. She denied that the victim ever threatened to call DCS on her. She also explained that the accusations against the victim's biological father were made by a friend who claimed that he touched her daughters. The victim was interviewed by the Carl Perkins Center when she was four years old, but she did not say anything about her father's touching her, so DCS did not get involved. The victim told her mother about Defendant's touching her on the Sunday prior to his arrest on December 11, 2014.

*Sentencing Hearing*

The State entered into evidence the presentence report. Defendant's criminal record included three convictions for domestic assault as well as resisting arrest and driving under the influence of an intoxicant. The victim and her mother chose not to testify, but the presentence report contained victim impact statements from both asking for a maximum sentence. Defendant chose not to present any proof or make a statement of allocution.

The trial court determined that Defendant was a Range I offender. The trial court merged the two counts of aggravated sexual battery into a single conviction, finding that "the touching of the breast area occurred pretty much simultaneously or within a relatively short period of time at the same time that the touching of the vaginal area occurred." Both parties agreed that Defendant was not eligible for probation. The trial court found that Defendant had a previous history of criminal behavior and gave that factor "great weight for enhancement purposes." The trial court noted that several of Defendant's prior criminal charges occurred within a few months of each other while he would presumably still be on probation for the earlier charges. The trial court found that Defendant abused a position of private trust as the victim's stepfather and by taking "advantage of an opportunity when the mother was gone to take the child into this bedroom area, to sexually abuse the child as she described in court." The trial court noted the Defendant's health, education, and work history and found that there was not much indicated in the presentence report that could be considered as a mitigating factor. The trial court imposed a sentence of twelve years to be served at 100% as a violent offender and placed Defendant on community supervision for life.

## Analysis

*Sufficiency of the Evidence*

Defendant challenges the sufficiency of the evidence supporting his conviction for aggravated sexual battery. Specifically, Defendant contends that "[t]he record in this case shows that the jury simply dismissed obvious untrue statement made by [the victim] at trial that directly discredited her testimony in this case." Additionally, Defendant argues that "the victim in this case failed to point out to the jury what she meant by her private parts/areas so as to prove that this included her genitalia." The State responds that "[t]he evidence was more than sufficient to convict Defendant," arguing that any inconsistencies in the victim's testimony were assessed by the jury and that the victim's description of the Defendant's touching satisfied the statutory definition of "intimate parts." We agree with the State.

- 6 -

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). The jury's verdict replaces the presumption of innocence with one of guilt; therefore on appeal, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *Bland*, 958 S.W.2d at 659). It is not the role of this court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id*. The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

As applicable to this case, aggravated sexual battery is the unlawful sexual contact with a victim by the defendant when the victim is less than thirteen years of age. T.C.A. § 39-13-504(a). "Sexual contact" is defined as including "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). "Intimate parts" include "the primary genital area, groin, inner thigh, buttock or breast of a human being." T.C.A. § 39-13-501(2).

Viewing the evidence in a light most favorable to the State, the proof showed that on the evening of November 22, 2014, the victim's mother took the victim's stepbrother to the hospital after a four-wheeler accident, leaving Defendant alone with the victim and the other children. Defendant called the victim into his bedroom, where he proceeded to touch the victim with his hands over her clothes. The victim testified that Defendant touched her "lower area," which she explained is "[w]here [her] underwear is," and her "up here," indicating her chest. Defendant then removed the victim's clothing and again touched her "lower area," using his hands to touch the inside and the outside of her

"private parts." Defendant then removed his own clothing and had the victim lie on the bed, where he proceeded to touch her "private areas" with his "private areas." The victim testified that it hurt. It was undisputed that the victim was nine years old at the time.

Defendant points out inconsistencies between the victim's trial testimony and her statement to Dr. Piercy made just weeks after the incident, particularly the absence of any inappropriate photographs on Defendant's phone or any testimony by the victim regarding anal penetration, the use of a blindfold, or Defendant's ejaculation. However, the jury as the trier of fact was in the best position to assess the credibility of the witnesses and resolve any factual disputes. In fact, by its verdict, the jury determined that there was not sufficient evidence to find the Defendant guilty beyond a reasonable doubt of rape of a child, which requires sexual penetration, despite the medical exam revealing "definitive evidence of penetrating trauma." *See* T.C.A. § 39-13-522(a). We will not second-guess the jury's credibility determinations.

As to Defendant's argument that the victim did not specify that Defendant touched her genitalia, such is not required under the statutory definition of "intimate parts." *See* T.C.A. § 39-13-501(2). Even if the victim's description of Defendant's touching of her "up here" was not specific enough to indicate that he touched her breast, her description of her "lower area," "[w]here [her] underwear is," and her "private parts" can reasonably be construed as including her primary genital area, groin, inner thigh, or buttock. Resolving all factual disputes in favor of the State, as we must on appeal, the evidence is sufficient to establish that Defendant touched the victim's intimate parts, or at least the clothing covering her intimate parts, for the purpose of sexual arousal or gratification. Defendant is not entitled to relief.

*Sentencing*

Defendant argues that his twelve-year sentence in this case was excessive and that the trial court made "clearly erroneous assessments of the evidence" necessitating a remand for resentencing. Specifically, Defendant notes that his criminal record as reflected in the presentence report did not contain any felony convictions and the most recent misdemeanor conviction was in 2003, eleven years prior to the offense in this case. Additionally, Defendant argues that "the record fails to support the trial court's finding that [Defendant] was in a position of trust with respect to the victim." The State responds that the trial court did not abuse its discretion in imposing the maximum sentence within the range. We agree with the State.

Appellate review of sentencing is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of an abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of

the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this court must presume the sentence to be reasonable. *Bise*, 380 S.W.3d at 704-07. As the *Bise* court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708. The defendant bears "the burden of showing that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c). Although the trial court should consider enhancement and mitigating factors, the statutory enhancement and mitigating factors are advisory only. *See* T.C.A. § 40-35-113, -114; *see also Bise*, 380 S.W.3d at 699 n.33, 704; *State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). "[A] trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10.

In this case, the trial court correctly found that because Defendant did not have any prior felony convictions, he was classified as a Range I offender. *See* T.C.A. 40-35-105. For the Class B felony conviction of aggravated sexual battery, Defendant was subject to a sentencing range of eight to twelve years. *See* T.C.A. § 40-35-112(a)(2). The trial court found as an enhancement factor that Defendant had a history of criminal convictions in addition to those necessary to establish his range. *See* T.C.A. § 40-35-

114(1).  This court has often upheld sentences that were enhanced under this factor when the only prior convictions on a defendant's record were misdemeanors.  *See, e.g.*, *State v. Demarcus Lashawn Blackman*, No. M2016-01098-CCA-R3-CD, 2017 WL 3084852, at *5-6 (Tenn. Crim. App. July 20, 2017) (finding trial court correctly applied enhancement factor (1) based upon the defendant's prior record of misdemeanor convictions and upholding maximum Range I sentence), *no perm. app. filed*; *State v. Thomas Antonio Ricketts*, No. M2016-00816-CCA-R3-CD, 2017 WL 1830102, at *5 (Tenn. Crim. App. May 5, 2017) (finding no abuse of discretion when trial court enhanced the defendant's Range I sentence based on numerous prior misdemeanor convictions), *no perm. app. filed*.  The record adequately supports the trial court's finding of a history of criminal convictions in addition to those necessary to establish Defendant's range.

As to Defendant's argument that the record does not support the trial court's finding that Defendant occupied a position of private trust with respect to the victim, *see* T.C.A. § 40-35-114(14), we disagree.  Testimony at trial from the victim, her mother, her stepbrother, and Defendant himself established that Defendant was the victim's stepfather and that he lived with the victim and her family for several years prior to this incident.  Moreover, the victim and her siblings were left in Defendant's sole care while her mother and stepbrother went to the hospital on November 22, 2014, and it was during this time that he molested the victim.  The Tennessee Supreme Court has held that an adult perpetrator "occupies a position of 'presumptive private trust' with respect to" a minor victim if "the adult perpetrator and minor victim are members of the same household." *State v. Blackstock*, 19 S.W.3d 200, 212 (Tenn. 2000); *see also State v. Carico*, 968 S.W.2d 280, 286 (Tenn. 1998) ("There can be no question that the rape of a child residing in the family is an abuse of private trust.").  The record more than adequately supports the trial court's application of this enhancement factor.  The trial court did not abuse its discretion in sentencing Defendant to the maximum sentence within his range.  Defendant is not entitled to relief.

CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE